## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

| | |
|---|---|
| IN RE:  FREDDY MAY and | CASE NO.: 4:17-bk-10970 |
| AMBER MAY, DEBTORS | CHAPTER 13 |
| | |
| FREDDY MAY and AMBER MAY | PLAINTIFFS |
| | |
| V.                    AP NO.: 4:18-ap-01057 | |
| | |
| MIDLAND FUNDING, LLC and | |
| MIDLAND CREDIT MANAGEMENT, INC. | DEFENDANTS |

### MEMORANDUM OPINION AND ORDER

The debtors, Freddy and Amber May, filed their *Class Action Complaint* ("Complaint") on May 4, 2018. The defendants, Midland Funding, LLC and Midland Credit Management, Inc. ("Midland"), filed *Defendants' Motion to Compel Arbitration and to Strike Class Allegations and Memorandum in Support* ("Motion") on June 25, 2018, which drew *Plaintiffs' Memorandum in Opposition to Defendants' Motion to Compel Arbitration and Strike Class Allegations* ("Response") on July 25, 2018, each supplemented by sur-replies. Reserving all other matters, the court heard the Motion and Response solely as to the request for arbitration on August 30, 2018, and took the matter under advisement. For the reasons stated herein, Midland's request for arbitration is denied.

### I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157. This is a related and core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), (O), and (c)(1). The

following opinion and order constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.[1]

## II. Background and Analysis

Freddy May[2] opened a Lowe's credit card account financed through Synchrony Bank ("Synchrony") on May 5, 2013. According to the debtors, Synchrony received notice of their bankruptcy filing and then "transferred data about those debts to Midland under a written agreement." (Complaint, May 4, 2018, ECF No. 1, at ¶ 15.) Thereafter, Midland filed a proof of claim for an amount in excess of the scheduled debt. Despite representations that the proof of claim amount did not include interest or other charges, the debtors assert that Midland "knows that interest and fees are in the claim amount, [but] Midland direct[s] its employees to file Proofs of Claim that assert no interest or fees are in the claim amount." (Compl., at ¶ 25.) The debtors contend that this practice violates three provisions of Federal Rule of Bankruptcy Procedure 3001: (1) section (a) for "failing to file a Proof of Claim that conform[s] substantially to the Official Form because it failed to accurately disclose that interest, fees, expenses, or charges were included in the claim amount"; (2) section (c)(1) based on the alleged failure of Midland to adequately provide the written document underlying its claim;[3] and (3) section (c)(2) for failure "to file with its Proof of Claim an itemized statement of the interest, fees, expenses or charges

---

[1] This proceeding is conducted in a summary manner as contemplated by 9 U.S.C. § 4. This opinion and order is based on the general averments in the pleadings as supplemented by the exhibits, arguments, and statements by counsel.

[2] The facts currently before the court reflect that separate debtor, Freddy May, may be the only party on the card account. If so, presumably, Amber May is included as a plaintiff as the contested proof of claim is filed in their jointly administered case.

[3] This section is mentioned in the body of the Complaint but not in Count II.

that were incurred."[4] (Compl., at ¶¶ 29–30, 55–56.) Further, debtors assert that the aggregate of these alleged transgressions violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692.

The debtors seek damages primarily in the context of statutory damages and fees attendant to a class action. (Compl., at 11.) The bankruptcy specific prayer is in the nature of injunctive relief preventing inaccurate proofs of claim being filed in the future, requiring an amended proof of claim with supporting documentation in the instant case, and disallowing the claim if not properly amended. (Compl., at 12.)

Midland asks the court to compel arbitration of all issues raised in the Complaint. During argument, the debtors conceded that a valid arbitration clause exists between the debtors and Synchrony and that the dispute in question would, absent any bankruptcy implications, fall within its ambit as a collection related controversy. The debtors also conceded during argument that they knew of no statutory or legal authority that would restrain alienability of an arbitration clause.[5] While conceding those points, the debtors interpose two hurdles to arbitration: (1) that Midland did not succeed to Synchrony's right to compel arbitration, and (2) if Midland does have the right to request arbitration, this court should decline to do so. Each argument is addressed in turn.

### 1. Transfer of Rights

The debtors question whether Midland purchased and enjoys Synchrony's right to enforce arbitration. Specifically, the debtors assert that the transfer documentation

> may only transfer a right to receive payment while Synchrony maintains the other rights of the credit card account agreement, including the right to charge Midland

---

[4] This section is mentioned in Count II but not in the body of the Complaint.

[5] As discussed during a pretrial conference and at argument, the principal question is whether arbitration is in whole or in part appropriate to resolve the issues raised in the Complaint. All other issues, including the motion to dismiss and class action status, are reserved until after the appropriate forum or forums are determined.

> for access to information and documents. The Motion [ ] must fail if Midland only bought the right to receive payments rather than all the rights of the credit card agreement.

(Response, July 25, 2018, ECF No. 14, at 7.) The debtors advance this argument in two subparts: first, whether Midland adequately provided a full and complete copy of the actual contract between Synchrony and Midland, and, second, whether the full terms of that agreement encompass the transfer or assignment of the right to compel arbitration.

Midland adequately addressed the first issue by tendering to the court an unredacted purchase agreement (defined and discussed in greater length below). The court reviewed the unredacted version *in camera* and submits that the redactions do not incidentally or materially affect the issue of what rights were transferred under the agreement and do not inform the basis of the findings and conclusions stated herein.

Remaining is the question of whether Midland succeeded to Synchrony's contractual rights regarding arbitration. Jodi Anderson, through her affidavit and on behalf of Synchrony, indicates that on May 5, 2013, separate debtor, Freddy May, opened a Lowe's credit card account. On or about May 7, 2013, Synchrony sent both a Lowe's plastic card and a credit card agreement that contains the provisions concerning arbitration. Thereafter, Mr. May made charges on his account. The last charge was posted on December 4, 2016, and the last payment was received on November 17, 2016. Synchrony charged off the account due to nonpayment on February 26, 2017. Thereafter, "[a]ccording to Synchrony's records, Synchrony sold all rights, title and interest in the Account to [Midland] on or about March 22, 2017." (Affidavit of Jodi Anderson, June 25, 2018, ECF No. 8-1, at ¶ 10.) The credit card agreement information supplied to Mr. May included a clause under the heading "Assignment" that provided that Synchrony "may sell, assign or transfer any or all of our rights or duties under this Agreement or your

4

account, including our rights to payment. We do not have to give you prior notice of such action." (Aff. of Jodi Anderson, at 5.) Again, the debtors concede that a valid arbitration clause exists and, absent any bankruptcy implications, collection disputes would be within its ambit. Further, the debtors concede that they know of no statutory or other legal authority that would suggest that arbitration rights cannot be transferred to another party. The debtors merely argue that contractually Synchrony did not transfer or assign its arbitration rights to Midland; rather, the debtors argue Synchrony transferred only its right to receive payment on the accounts receivable.

An examination of the contractual terms that contemplated and subsequently effectuated the transfer of the account from Synchrony to Midland compels a different conclusion. Specifically, Synchrony as Seller and, *inter alia*, Midland as Buyer, executed a Forward Flow Accounts Purchase Agreement ("Purchase Agreement") dated August 30, 2016.

The operative transfer provision for the "Purchase and Sale of Accounts" provides: "[o]n each Transfer Date, Seller shall sell and Buyer shall buy all right (including the right to legally enforce, file suit, collect, settle or take any similar action with respect to such Account), title and interest in and to the Accounts identified in a Notification File[.]" (Purchase Agreement, Aug. 22, 2018, ECF No. 26-1, at § 2.1.) On sale, title to the account passes to Midland as the Purchase Agreement states "upon the purchase by Buyer of the Accounts hereunder from Seller, Buyer shall acquire unencumbered title in and to the Accounts, on each Transfer Date, except for such encumbrances, liens and claims caused or created by Buyer." (Purchase Agreement, at § 4.1(d).) *See also*, the Bill of Sale template attached to the Purchase Agreement as Exhibit A that provides:

> [f]or value received and in further consideration of the mutual covenants and conditions set forth in the Forward Flow Accounts Purchase Agreement (the

5

> "Agreement"), dated as of this 30th day of August, 2016 by and between . . . , Seller hereby transfers, sells, conveys, grants, and delivers to Buyer, its successors and assigns, without recourse except as set forth in the Agreement, the Accounts as set forth in the Notification Files (as defined in the Agreement), delivered by Seller to Buyer on each Transfer Date, and as further described in the Agreement.

(Bill of Sale, Aug. 22, 2018, ECF No. 26-1, at 40.)

Contrary to the debtors' assertion that Midland purchased only the receivable, the "Account" definition is conjunctive, defined as "any charged-off credit card account *and associated receivable* owned by Seller that is being sold to Buyer pursuant to the terms of this Agreement with respect to which there is an Account Balance." (Purchase Agreement, at § 1.1) (emphasis added). Clearly stated, the Purchase Agreement contemplates the transfer of both the account itself and the associated receivable, not just the receivable. Commensurately and consistent with the more expansive definition of an "Account," an "Account Balance" is separately defined to mean "any credit account that is being sold to Buyer pursuant to the terms of this Agreement, as such *balance* exists as of the Cut-Off Date, to the extent such balance is set forth on the applicable Notification File." (Purchase Agreement, at § 1.1) (emphasis added).

Continuing, the Purchase Agreement contemplates a Transfer Date on which the seller sends the applicable Notification File to Midland. The Purchase Agreement defines "Notification File" as

> (a) a Computer File identifying the Accounts to be delivered to Buyer on each Transfer Date, which listing shall contain the following information with respect to each Account: (a) the Required Information; and (b) the Additional Information, to the extent that the Additional Information is available in Seller's books and records.

(Purchase Agreement, at § 2.1.) The Required Information and the Additional Information are set forth on Exhibits H-1 and H-2 to the Purchase Agreement and include information one would typically need for collection purposes. But, in the event that Midland requires additional

6

information, Midland may "submit to Seller reasonable requests for Account Documents, which requests shall follow the procedures set forth in Exhibit B hereto and, to the extent such information is in the possession of Seller, Seller shall provide it subject to and in accordance with the provisions below in this Section 5.3." (Purchase Agreement, at § 5.3(a)(i).) The Purchase Agreement defines an "Account Document" as

> an Affidavit or any application, replacement terms and conditions, last twelve months of reproduced billing statements to include a replacement copy of the last statement prior to charge off and/or the replacement copy of the charge-off statement, any other billing statement, sale notification letter, or other correspondence relating to an Account and relevant to the collection of the related Account, to the extent such item is in Seller's possession and reasonably available to Seller, in the form, if any it exists in Seller's possession, *which in all cases the terms are the same as that sent to the Account Debtor*, but excludes any information provided by parties other than the Seller or the Account Debtor associated with the Account.

(Purchase Agreement, at § 1.1) (emphasis added).

As testified to by Jodi Anderson, the arbitration provision is contained in the credit card agreement originally sent to Mr. May. Additionally, Synchrony must provide, as a matter of course, certain other documents. "Within thirty (30) days of the applicable Transfer Date, Seller will provide the Required Account Documents for each Account to Buyer." (Purchase Agreement, at § 5.3(a)(iv).) The term "Required Account Documents" is expansive, meaning

> [a]ccount [d]ocuments that Seller, its officers, directors, agents, employees or representatives provided to an Account Debtor in connection with an Account which include the following: (i) last twelve (12) billing statements of the Account (reduced if an Account was originated less than twelve (12) months from the date of charge off), (ii) *the terms and conditions,* (iii) the Account statement at the time of charge-off, and (iv) the statement of last account activity.

(Purchase Agreement, at § 1.1) (emphasis added). In his affidavit on behalf of Midland, Sean Mulcahy indicates that the account, when transferred to Midland on March 22, 2017, included from Synchrony a copy of the credit card agreement that governed the account. (Affidavit of

7

Sean Mulcahy, June 25, 2018, ECF No. 8-2, at ¶¶ 7–8.) This credit card agreement included the terms concerning arbitration.

Further, account servicing is clearly delineated between the parties pre- and post-transfer, in the Purchase Agreement.

> Until the applicable Transfer Date, Seller may continue to service the Accounts to be transferred and, in connection therewith, shall have the right to handle the Accounts and any matter relating to the Accounts in any manner that Seller deems appropriate, subject to the requirements of Applicable Law and this Agreement; and provided that, following the Cut-Off Date, Seller shall not initiate any outbound collection efforts on the applicable Accounts, but Seller shall be permitted to accept payments in accordance with its ordinary credit policy. Buyer shall be bound by the regular day-to-day actions taken by the Seller in compliance with Applicable Law with respect to the interim servicing of any Account prior to the Transfer Date. Buyer shall not be bound by extraordinary or unusual actions taken by Seller with respect to an Account unless Seller shall have notified Buyer in writing and Buyer agrees to such activities. Buyer shall be bound by the actions taken by the Seller in compliance with Applicable Law with respect to any Account prior to the Transfer Date. Buyer shall take no action to communicate with Account Debtors (or their agents or representatives) or enforce, service or otherwise manage any Account until after the purchase of the Accounts, and only in accordance with any and all applicable federal and state laws, rules, regulations and court orders. In no event shall Seller be deemed a fiduciary for the benefit of Buyer with respect to the Accounts or any Account.

(Purchase Agreement, at § 5.1.) Further, the Purchase Agreement contemplates that Midland will be servicing the account post-transfer, providing "[a]ll actions or omissions by Buyer with respect to the Accounts, including (but not limited to) all servicing, billing, processing, collections, and recovery operations and any communications or notices to Account Debtors, shall conform in all respects to any and all Applicable Laws." (Purchase Agreement, at § 5.2.) Commensurately, Synchrony is relieved from its servicing responsibilities post-transfer. See, Purchase Agreement, at § 5.7(a), denoting "(a) [e]xcept as stated herein, Seller shall have no obligation to perform any servicing activities with respect to Accounts from and after the applicable Transfer Date."

8

The Purchase Agreement is governed by New York law. (Purchase Agreement, at § 12.6.) Under New York law, "[c]onstruction of an unambiguous contract is a matter of law," and should be enforced according to its terms. *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). Quite simply, the Purchase Agreement, by its clear and express terms, transfers the account, not just the attendant accounts receivable.

### 2. Arbitration

This class action purports to address alleged pervasive violations of Federal Rule of Bankruptcy Procedure 3001 through the filing of proofs of claims that contain "false statements concerning whether interest or fees [are] embedded in their claim amounts." (Compl., at ¶ 2.) Specifically, Midland filed a proof of claim for an amount in excess of the scheduled debt. According to the debtors, Midland "knows that interest and fees are in the claim amount, [but] Midland direct[s] its employees to file Proofs of Claim that assert no interest or fees are in the claim amount." (Compl., at ¶ 25.) The debtors contend that this practice violates Federal Rule of Bankruptcy Procedure 3001: (1) section (a) for "failing to file a Proof of Claim that conform[s] substantially to the Official Form because it failed to accurately disclose that interest, fees, expenses, or charges were included in the claim amount"; (2) section (c)(1) based on the alleged failure of Midland to adequately provide the written document underlying its claim; and (3) section (c)(2) for failure "to file with its Proof of Claim an itemized statement of the interest, fees, expenses or charges that were incurred." (Compl., at ¶¶ 29–30, 55–56.) Further, debtors assert that the aggregate of these alleged transgressions violate the Fair Debt Collection Practices Act.

The debtors seek damages primarily in the context of statutory damages and fees attendant to a class action. (Compl., at 11.) The bankruptcy specific prayer is in the nature of

injunctive relief preventing inaccurate proofs of claim being filed in the future, requiring an amended proof of claim with supporting documentation in the instant case, and disallowing the claim if not properly amended. (Compl., at 12.) In considering whether arbitration is appropriate, this opinion does not address the merits of any of the asserted causes of action or relief requested.

The debtors argue that "a bankruptcy court should not compel arbitration in core proceedings where arbitration would create an inherent conflict with the purposes of the Bankruptcy Code." (Resp., at 1.) Thus, the sole remaining issue is whether on that basis this court has the discretion to deny Midland's request for arbitration.

Despite the somewhat adhesive nature of form contracts generally, they nevertheless represent voluntary contractual relationships between parties that, presumably, should be enforced according to their terms, including arbitration clauses. In *Gavilon Grain*, the district court recognized the following:

> the FAA heralds the robust federal policy favoring arbitration agreements. The bankruptcy court noted this law but moved past it quickly. "A written provision in. . . a contract . . . involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

*Gavilon Grain, LLC v. Rice*, No. 2:17-cv-40-DPM, 2017 WL 3508721, at *2 (E.D. Ark. Aug. 16, 2017). The *Gavilon Grain* court went on to recognize "an unmistakably strong line of cases in the last three decades [where] the Supreme Court has implemented this pro-arbitration policy, turning back almost every effort to temper it." *E.g., Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011); *Green Tree Fin. Corp.–Alabama v. Randolph*, 531 U.S. 79 (2000); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991).

10

> Equally, however, the United States Supreme Court has recognized an exception.
>
> The Federal Arbitration Act [FAA] supports "the fundamental principle that arbitration is a matter of contract," and, as such, courts must enforce arbitration agreements according to the terms agreed upon by the parties. *Rent-A-Center, West, Inc. v. Jackson*, 130 S.Ct. 2772, 2776 (2010). A party opposing arbitration has the burden of showing "that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987). Congressional intent to prohibit waiver of a judicial forum may be ascertained from (1) the statute's text, (2) its legislative history, or (3) "an inherent conflict between arbitration and the statute's underlying purposes." *Id.* Neither the bankruptcy code nor its legislative history addresses arbitration in this context, and other courts have found that without some literal guidance from either source, the relevant prong of the *McMahon* test becomes whether there is an inherent conflict between the FAA and the bankruptcy code. *In re Mintze*, 434 F.3d 222, 231 (3rd Cir. 2006); *In re Rozell*, 357 B.R. 638, 642–43 (Bankr. N.D. Ala., 2006).

*Blok v. The College Network, Inc. and Southeast Fin. Fed. Credit Union* (*In re Christine A. Blok*), Ch. 13 Case No. 5:11-bk-70960, Adv. No. 5:11-ap-07104, slip op. at 5 (Bankr. W.D. Ark. Jan. 11, 2012).

The *McMahon* analysis requires that Congress's intention to override the Federal Arbitration Act in a particular instance be discerned from either the text of Rule 3001, the commensurate legislative history,[6] or by identifying an inherent conflict between arbitration and the Bankruptcy Code in this instance.

During argument, the parties conceded that neither the text nor the legislative history contains language that reflects a specific intent to override a valid arbitration agreement in these circumstances. Accordingly, this concession reduces the court's analysis to whether the

---

[6] Or, for that matter, from the entirety of the Code, rules, or legislative history.

11

underlying purposes of the Bankruptcy Code inherently conflict with arbitration in the context of a dispute base on Rule 3001.[7]

Initially pertinent, but not dispositive, is whether this is a core proceeding. As stated in *Blok*, "[o]ther circuits have noted that even in the case of core proceedings, bankruptcy courts do not have discretion to refuse to compel arbitration without a finding that there is an inherent conflict between the bankruptcy code and the Arbitration Act or that arbitration will jeopardize the objectives of the bankruptcy code." *Blok*, Adv. No. 5:11-ap-07104, slip op. at 5 (citing *MBNA Am. Bank v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp.* (*In re Nat'l Gypsum Co.*), 118 F.3d 1056, 1069 (5th Cir. 1997)). See also *Continental Ins. Co. v. Thorpe Insulation Co.* (*In re Thorpe Insulation Co.*), 671 F. 3d 1011, 1020–21 (9th Cir. 2012) (internal citations omitted).

> Several of our sister circuits that have addressed the issue have considered, as a threshold matter, a distinction between core and non-core proceedings. In non-core proceedings, the bankruptcy court generally does not have discretion to deny enforcement of a valid prepetition arbitration agreement. In core proceedings, by contrast, the bankruptcy court, at least when it sees a conflict with bankruptcy law, has discretion to deny enforcement of an arbitration agreement. The rationale for the core/non-core distinction, as explained by the Second Circuit, is that non-core proceedings "are unlikely to present a conflict sufficient to override by implication the presumption in favor of arbitration," whereas core proceedings "implicate more pressing bankruptcy concerns."

The claims litigation count is without a doubt core as arising in or under the Bankruptcy Code as contemplated by 11 U.S.C. §§ 1334 and 157 and 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O). Conversely, the Fair Debt Collection Practices Act cause of action is facially non-core and, at best, is only related to this proceeding as having a conceivable effect on the debtors' estate.

---

[7] The *Shearson/American Express, Inc. v. McMahon* framework must "resolve the tension" between the FAA and the Bankruptcy Code. *Gavilon Grain*, 2017 WL 3508721, at ∗2. "If Congress intended to limit or prohibit waiver of the bankruptcy forum for the turnover claim, then that intention would appear in . . . the 'inherent conflict between arbitration and the statute's underlying purposes.'" *Id.* (quoting *McMahon*, 482 U.S. at 227.)

12

> The Eighth Circuit has stated that a bankruptcy court still may have "related to" jurisdiction in a non-core proceeding when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action and which in any way impacts upon the handling and administration of the bankrupt estate."

*Blok*, Adv. No. 5:11-ap-07104, slip op. at 4 (citing *Dogpatch Prop., Inc. v. Dogpatch U.S.A., Inc. et al.* (*In re Dogpatch U.S.A., Inc.*), 810 F.2d 782, 786 (8th Cir. 1987) (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1984)). Given that at least one cause of action is unquestionably core, a *McMahon* analysis is appropriate. Whether that analysis is independent of or subsumes the second count under the Fair Debt Collection Practices Act is discussed below.

Claims and the proof of claim process have a purpose in bankruptcy without equivalent in nonbankruptcy proceedings. Rule 3001 and the related official proof of claim form detail and require a great deal of specific information concerning claims. They include a copy of the underlying agreement, evidence of perfection, a "itemized statement of the interest, fees, expenses, or charges," necessary to cure defaults on debts secured by property, and, with respect to open-end or revolving consumer credit, a list of very specific items. FED. R. BANKR. P. 3001(c)(2)(A) (2018). The failure to provide the information required in Rule 3001 could exclude this information as evidence and possibly afford "other appropriate relief," including "reasonable expenses and attorney's fees." FED. R. BANKR. P. 3001(c)(2)(D)(ii) (2018). Filing of a proof of claim "shall constitute prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f) (2018). The debtor or any other interested party must file an objection and bears the burden of rebutting the prima facie presumption with the ultimate burden thereafter shifting to the claimant. FED. R. BANKR. P. 3001(f), 3007 (2018).

At first glance, these facets of the claims process would appear to be the normal incidences of evidentiary proof that one might expect in either an arbitration or judicial

proceeding to collect a debt. But neither event, arbitration nor litigation, typically occur without an accompanying dispute as to either liability or amount. The filing of a petition in bankruptcy creates an entirely different scenario, and the proofs of claim serve a number of purposes, many without an existence outside of bankruptcy. Ideally, the honest but unfortunate debtor would, through his schedules, disclose all of his assets, all of his debts, his complete financial circumstances prior to and at bankruptcy, his exemptions, and, by virtue of the chapter chosen, his desire for a Chapter 7 discharge or reorganization. The aggregate proofs of claim should, again ideally, seamlessly conform to the debtor's schedules and disclosures. Generally, no initiating contest exists as to liability and, frequently, none as to amount.

The disclosures and commensurate proof of claim process are unique to bankruptcy. Proofs of claim serve a number of purposes that only arise in the context of a bankruptcy proceeding—reconciling the accuracy of schedules; confirming and amplifying prepetition transactions disclosed in the statement of financial affairs; determining priority—a significant aspect of all bankruptcy proceedings; confirming secured versus unsecured debt and the commensurate values that must be addressed; and establishing the identities and amounts to be distributed either under a plan or through residual distributions to unsecured creditors in a Chapter 7 liquidation. Short of disclosing and administering all assets, nothing more complementary, integral, or significant in a bankruptcy proceeding exists than the full disclosure, prioritization, and treatment of debt. The entire proof of claim process is designed to serve bankruptcy specific goals; thus, the question is whether the service of these policies sufficiently dictate that bankruptcy courts and not arbitrators resolve issues integral to and arising solely from that process.

A similar circumstance presented itself before the United States Bankruptcy Court for the Northern District of Alabama. *Ellswick v. Quantum3 Group, LLC* (*In re Ellswick*), No. 15-40048-JJR, 2016 WL 3582586 (Bankr. N.D. Ala. June 24, 2016). In *Ellswick*, the debtor objected to a proof of claim on the basis of state law concerning advances on postdated checks and the Federal Truth in Lending Act. The debtor initiated the request for arbitration but at or about the same time filed an adversary proceeding alleging that the creditor's proof of claim violated Rule 3001 on the basis of a false representation that equally gave rise to a claim under the Fair Debt Collection Practices Act. Later, the debtor asked to compel arbitration in the adversary proceeding. The court declined to do so on the basis of waiver given the passage of time and participation in the litigation process prior to requesting arbitration. Alternatively, the court denied arbitration under a *McMahon* "inherent conflict" analysis, stating:

> The claims in the AP complaint begin and end with the proof of claim filed by Quantum in the underlying chapter 13 case and have no relation whatsoever with the validity or enforceability of the debt under non-bankruptcy law or the Consumer Agreement. Contrary to Ellswick's assertion, all the claims in the AP are strictly core; they could not arise anywhere other than in a bankruptcy case under title 11. The claims simply do not exist apart from Ellswick's bankruptcy case, and the action taken by Quantum during and in the case. To say, as Ellswick has, that because some FDCPA claims may exist in the abstract aside from a bankruptcy case does not answer the relevant question, which is: Could the particular FDCPA claims asserted in this specific AP exist apart from this bankruptcy case? The simple answer is no. The AP claims relate solely to the content of Quantum's proof of claim and its alleged failure to comply with Rule 3001, and have nothing to do with the validity or enforcement of the underlying debt, or prepetition matters. Accordingly, the court finds that the alleged FDCPA claims arose in Ellswick's bankruptcy case because of the content of Quantum's proof of claim, not because of some independent, prepetition occurrence or non-bankruptcy matter, and are, therefore, core proceedings within the context of 28 U.S.C. § 157(b)(1).

*Ellswick*, 2016 WL 3582586, at *3. The court additionally noted:

> [b]ecause the issues regarding the content of Quantum's proof of claim are unique to the bankruptcy process, and fall within a bankruptcy court's specialized knowledge, the court finds that allowing arbitration of the AP would conflict with

> the Bankruptcy Code's purpose of having a centralized forum—the bankruptcy court—determine purely bankruptcy issues that arose within the administration of the case, e.g., allowance of claims, as well as the form and content of claims. *See also McCallan v. Hamm*, 2012 WL 1392960, *7 (M.D. Ala. 2012) (denying arbitration of non-core breach of contract issues due to the effect on the bankruptcy estate and on "the larger bankruptcy process"); and *see Cooley v. Wells Fargo Fin. (In re Cooley)*, 362 B.R. 514, 520 (Bankr. N.D. Ala. 2007)("Stated another way, if the debtor brought the cause of action, contested matter or other dispute underlying the proceeding with him when he filed bankruptcy, no inherent conflict is likely to be found with the enforcement of contractual arbitration. However, if such cause of action, contested matter or other dispute could only exist *after* the bankruptcy case was commenced, then an inherent conflict exception under the *McMahon* standard is more likely to be found." (emphasis added)).
>
> Ellswick concedes that his Rule 3001 allegations indeed lie within this court's purview, but argues the FDCPA claims do not, and, therefore, contends that an arbitrator should decide both issues. This overlooks the fact that there are no FDCPA claims that Ellswick can assert apart from those based on Quantum's postpetition activity in the bankruptcy case. The bankruptcy court is uniquely qualified to decide matters—even FDCPA claims if they indeed may arise during the claims allowance process—which depend entirely upon the Code and Rules for their genesis.

*Ellswick*, 2016 WL 3582586, at *4–5.

In this instant case, the entirety of the debtors' claim arose postpetition out of a purely bankruptcy centric procedure, proofs of claim, and the cause of actions would have had no existence outside of bankruptcy. This analysis also applies to the FDCPA claim as its genesis is solely the alleged fraudulent conduct in the context of asserted fraudulent representations on the proof of claim.

While those factors alone may be dispositive, courts have suggested other considerations as guidance in whether to exercise discretion in these instances.

> Four factors are considered when deciding whether to compel arbitration: (1) Whether the issue can be resolved more expeditiously by the bankruptcy judge as opposed to through the arbitration process; (2) Whether or not special expertise is necessary in deciding the issue; (3) The impact on creditors of the debtor who were never parties to the agreement containing the arbitration clause; (4) Whether arbitration threatens assets of the estate.

*Slipped Disc Inc., dba Disc Go Round v. CD Warehouse, Inc.* (*In re Slipped Disc Inc.*), 245 B. R. 342, 345-46 (Bankr. N.D. Iowa, 2000) (citation omitted). Nothing suggests that this matter can be handled by an arbitrator any faster than this bankruptcy court. And, presumably, a bankruptcy court inherently has a better understanding of the necessary integrity and fundamental significance of the proof of claim process. The effect on other creditors and the property of the estate is a function of a quantum of proof; those broader implications are more properly decided by bankruptcy court than an arbitrator.

In *Gavilon Grain*, the district court reversed the bankruptcy court's decision to deny arbitration because the underlying issue of whether any debt was owed was non-core.

> The trustee's substantive claims against Gavilon must be arbitrated by the National Grain and Feed Association. Adjudicating whether Gavilon owes any debts that are property of Turner's chapter 7 estate is non-core. As the bankruptcy court noted, the weight of authority favors enforcing arbitration agreements that cover non-core matters. The bankruptcy court, therefore, is not the only place where the debt question can be answered. The parties' undisputed pre-petition arbitration agreements cover the trustee's contract and unjust enrichment claims. There is no irreconcilable conflict between the trustee's statutory right to turnover (eventually) of a matured debt that is the property of Turner's estate and having an arbitration to resolve the Gavilon/trustee dispute about whether any such debt exists. If one does, and Gavilon doesn't pay it, *then* the trustee can seek turnover and the bankruptcy court can order it. The bankruptcy court's concerns about limited discovery and cost will be present to some extent in every arbitration. They are not weighty enough here to tilt the balance against the alternative forum. While this Court has no doubt that the bankruptcy court could ably unravel the Turner/Gavilon knot, those parties agreed to another forum, and the substantive claims asserted by the trustee are insufficiently definite in terms of liability to be within the turnover statute's reach at this point.

*Gavilon Grain*, 2017 WL 3508721, at ∗6.

Here, however, no dispute existed prebankruptcy arising out of the contractual relationship between the parties. Rather, the issues presented arose specifically as a result of postpetition actions by the creditor in the context of employing purely bankruptcy specific

17

processes to participate in this bankruptcy case and about which the debtors believe the creditor engaged in fraudulent conduct.

### III. Conclusion

Certainly, circumstances exist where a *McMahon* analysis would compel arbitration that both complements and benefits the bankruptcy process. Conversely, unconstrained enforcement of arbitration clauses would encourage and permit creditors to opt for a favorably perceived and parallel proceeding that would fragment, moot, and deprive all parties of the benefits of a single integrated forum designed specifically to address the accommodation and reorganization of debt. Arbitration is simply not appropriate in this circumstance. The central issue, claims litigation, is specifically core. The "related to" count under the Fair Debt Collection Practices Act arises solely as a result of the alleged improprieties in the course of completing and filing a proof of claim. No part of either count would or could exist independent of or outside this bankruptcy case. Whether there is a pervasive fraudulent policy and practice as debtors suggest is a matter of scrutiny and offense to a bankruptcy court, not an arbitrator.

The request for arbitration contained in the Motion is denied. The request for dismissal will be set by subsequent notice. Thereafter, if appropriate, the court will consider the class action issues raised in the Complaint.

IT IS SO ORDERED.

Dated this 3rd day of October, 2018.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc: William Thomas Crowder
Thomas J. Diaz
John Michael Rainwater
Jason B. Tompkins
Geoffrey B. Treece
Mary-Tipton Thalheimer
Mark T. McCarty